**Darida GONZALEZ, et al., Plaintiffs,**

v.

**BIOVAIL CORPORATION INTERNATIONAL, et al., Defendants**

**No. CIV. 03–2116JP.**

United States District Court, D. Puerto Rico.

Jan. 28, 2005.

Mayra M. González–Reyes, Esq., José R. González–Nogueras, Esq., Jiménez, Graffam & Lausell, San Juan, for Plaintiff.

Vicente J. Antonetti, Esq., Angel X. Viera–Vargas Esq., Goldman Antonetti & Córdova, San Juan, for Defendant.

## OPINION AND ORDER

PIERAS, Senior District Judge.

## I. INTRODUCTION

Before the Court is Defendants Biovail Corporation and Biovail Laboratories'

(hereinafter collectively, "Defendants", or "Biovail") "Motion for Summary Judgment With Statement of Uncontested Material Facts" (docket No. 33) and Memorandum in support thereof (docket No. 34); Plaintiffs' opposition thereto (docket Nos. 39 and 40); and Defendants' Reply to Plaintiffs' opposition (docket No. 44).

Plaintiffs in this case are Dárida González and her husband Carlos Valencia Guillermety. Plaintiffs brought forth this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e—2000h(6), and several related claims under Puerto Rico law, alleging sex and gender discrimination. Defendants now move for summary dismissal of Plaintiff's claims, stating that she has failed to establish a prima facie case of gender-based discrimination or pregnancy status discrimination, and further, that she has been unable to present any evidence of discrimination that would arguably support her case. Defendants further allege that the damages claimed by Plaintiff are the product of a work-related accident or illness, and as such are covered by the applicable workmen's compensation statute under a valid policy issued by the "Corporación del Fondo del Seguro del Estado" (CSIF) at the time of the incident. For the foregoing reasons, the Court hereby **GRANTS** Defendants' motion for summary judgment, and **DISMISSES WITH PREJUDICE** all federal causes of action. The Court does not reach Plaintiff's claims brought under Puerto Rico law, and therefore **DISMISSES** them **WITHOUT PREJUDICE**.

## II. LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where, after drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue of material fact for trial. *See Pagano v. Frank*, 983 F.2d 343, 347 (1st Cir.1993). A fact is material if it might affect the outcome of the case. *Mack v. Great Atl. and Pac. Tea Co., Inc.*, 871 F.2d 179, 181 (1st Cir.1989). An issue is "genuine" if sufficient evidence exists to permit a reasonable trier of fact to resolve the issue in the non-moving party's favor. *See Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 24 (1st Cir.1989).

The party filing a motion for summary judgment bears the initial burden of proof to show "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party to show affirmatively, through the filing of supporting affidavits or otherwise, that a genuine issue exists for trial. *See Goldman v. First National Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir.1993). In discharging this burden, the non-moving party may not rest upon mere allegations or denials of the pleadings. See Fed. R.Civ.P. 56(e). On issues where the non-moving party bears the ultimate burden of proof, it must present definite, competent evidence to rebut the evidence put forth by the moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–257, 106 S.Ct. 2505, 2514–2515, 91 L.Ed.2d 202 (1986). Indeed, summary judgment may be appropriate " . . . where elusive concepts such as motive or intent are at issue . . . if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Woods v. Friction Materials, Inc.*, 30 F.3d 255, 259 (1st Cir.1994).

## III. FINDINGS OF FACT

After thoroughly evaluating the facts presented by the parties and the record as a whole, the Court makes the following findings of fact.

1. Plaintiff Dárida González Dávila is a citizen of the Commonwealth of Puerto Rico (hereinafter "Plaintiff").

2. Plaintiff resides in Toa Alta, Puerto Rico, and is a female adult who is 37 years of age.

3. Plaintiff Carlos E. Valencia Guillermety is a citizen of the Commonwealth of Puerto Rico.

4. Plaintiff Valencia resides in Toa Alta, Puerto Rico, and is Plaintiff González' husband.

5. Plaintiff is a licensed Engineer and a licensed Chemist, and has a Masters' Degree in Management of Environmental Protection.

6. Prior to her employment with Defendants, Plaintiff had five (5) years' experience in the fields of Engineering and Chemistry.

7. Co–Defendant Biovail Laboratories, Inc. is a corporation organized under the laws of Barbados, W.I., with its principal place of business located in Canada.

8. Co–Defendant Biovail Laboratories, Inc. is authorized to do business in Puerto Rico under registration No. 9596–F of the Corporations Register of the Commonwealth of Puerto Rico.

9. Co–Defendant Biovail Laboratories, Inc., owns and operates two manufacturing facilities in Puerto Rico, located in Carolina and Dorado.

10. Seventy two point seven percent (72.7%) of all of Biovail's officials and managers employed in its Puerto Rico operations are female, including the General Manager and the Human Resources Manager.

11. Sixty nine percent (69%) of all of Biovail's technical professionals employed in its Puerto Rico operations are female, including the engineering positions, such as the one occupied by Plaintiff.

12. On May 7, 2001, Plaintiff began working for Defendants as an engineer.

13. On February 25, 2002, Defendants evaluated Plaintiff, and found her performing well and meeting all her employer's expectations.

14. Plaintiff's position while in the employ of Co–Defendant Biovail Laboratories, Inc., was "Engineer," and she was assigned to the Engineering and Maintenance Department.

15. Plaintiff was physically based at the Dorado Plant.

16. At all pertinent times, Plaintiff's immediate supervisor was Orlando Marrero.

17. As an engineer, Plaintiff was principally responsible for the "qualification process" of manufacturing equipment.

18. The "qualification process" of manufacturing equipment in the pharmaceutical industry involves three (3) distinct steps, to wit: Installation Qualification (IQ) Operational Qualification (OQ) and Performance Qualification (PQ).

19. Each of the aforementioned steps is divided in three (3) specific phases: drafting, approval and execution of protocols.

20. A protocol is a document created to identify and record the results of the procedures and tests required to properly conduct either the IQ, OQ or PQ of pharmaceutical manufacturing equipment according to specifications.

21. The approval of a "protocol" involves the participation of different departments at Biovail, among others Engineering, Technical Services, Quality Control and Quality Assurance.

22. At the beginning of each year all persons employed at Biovail receive a list of their stated objectives, which are usually developed between the concerned employee and his/her supervisor and are generally guided by the general objectives that the company has set for itself for that particular year.

23. The successful attainment of such yearly objectives is the primary method of assessing an employee's performance at Biovail.

24. Plaintiff's highest salary while in the employ of Co–Defendant Biovail Laboratories, Inc., was $46,800.00.

25. On or about November of 2001, Plaintiff became pregnant with twins.

26. Plaintiff's performance during her first seven (7) months of employment with Biovail was evaluated as satisfactory by her supervisor, Mr. Orlando Marrero.

27. Plaintiff was pregnant at the time of the evaluation was made.

28. Mr. Marrero was aware of Plaintiff's pregnancy at the time the evaluation took place.

29. The fact of Plaintiff's and other female employees' pregnancy was a common occurrence in Biovail.

30. Fifteen (15) other employees at Biovail's Puerto Rico operations, including Orlando Marrero's secretary, Ms. Noemí Oquendo, became pregnant and/or enjoyed maternity leave during the years 2001 through 2004.

31. Plaintiff was the only one terminated from all employees in the group that became pregnant and/or enjoyed maternity leave during the years 2001 through 2004.

32. Plaintiff's peer at the Engineering and Maintenance Department, Brenda Pérez, began working at Biovail in January of 2002.

33. Ms. Pérez was pregnant at the time she was hired by Biovail, and was pregnant again at the time her deposition was taken on January 14, 2004.

34. Quality Assurance Manager Sandra Rodríguez began working for Biovail in 1995.

35. Ms. Rodríguez has had two (2) pregnancies while employed by Biovail, one in 1996 and one in 1999, and is still under the employ of Biovail.

36. At the beginning of 2002, Plaintiff received from supervisor Orlando Marrero her job and performance objectives for the year 2002, which are listed in a memorandum dated January 15, 2002.

37. Plaintiff's performance objectives listed in the aforementioned memorandum were as follows:

a. Complete qualification of the G–99 Equipment, including V–Blender, Collette Mixer, 48 inch Accela Cotta, Courtoy Tablet Press, MP 4/5, Tray Dryer;

b. Perform facility qualification on modified rooms and all the manufacturing facilities as per requirements;

c. Perform facility and equipment qualification of the Flash Dose pkg. area;

d. Perform qualification of AHU's # 100, 1100, 200, 300, 400, 500, 1800 and 1900.

e. Perform qualification of pkg. Line # 1 for Bupropion samples;

f. As a bonus, to develop maintenance and calibration SOP's for Glatt # 2, TK Fielder, Tray Dryer, MP 4/5, Micro Tower, Littleford, Fette Tablet Press, Aylward Transfer System, Klockner Thermoformer, CP 3000 Cartopack;

g. As an additional bonus, develop a cost-reduction project by Q3 with justification to be implemented.

38. At the time she signed the memorandum, Plaintiff never told Mr. Marrero that she could not comply with the objectives; she signed the form and accepted them.

39. Mr. Orlando Marrero received various complaints from Carmen Reyes,

the general manager, Sandra Rodríguez and María Díaz regarding the quality of Plaintiff's work.

40. Carmen Reyes also received the same complaints from María Díaz, the technical services manager, and from Sandra Rodríguez, the quality assurance manager.

41. María Díaz revised both IQ and OQ protocols prepared by personnel at the engineering department.

42. Ms. Díaz categorized the quality of the protocols drafted by Plaintiff as very deficient.

43. Documentation prepared by Plaintiff was usually incomplete, incorrect and inconsistent.

44. Plaintiff's protocols contained so many errors that there came a time when Ms. Díaz refused to review them.

45. Ms. Díaz is a licenced pharmacist with 14 years of experience in the industry.

46. Ms. Díaz testified under oath that she had never met a professional with deficiencies as glaring and serious as Plaintiff's.

47. According to QA Manager Sandra Rodríguez, who revised some of the protocols prepared by Plaintiff, the protocols prepared by Plaintiff needed more corrections vis a vis the ones submitted by other engineers.

48. Mr. José Rodríguez and Ms. Deliris Deliz were also in charge of reviewing the protocols.

49. Plaintiff's performance was qualified as good and satisfactory by José Rodríguez, the Quality Assurance Supervisor, and satisfactory by Deliris Deliz, Auditor of Quality Assurance.

50. There was at least one level of revision between Plaintiff's first draft of a protocol and the version that reached the Quality Assurance Personnel like Mr. Rodríguez and Ms. Deliz.

51. Mr. José Rodríguez sometimes used Plaintiff's protocols as models.

52. Mr. Rodríguez never heard his Supervisor, Ms. Sandra Rodríguez, complain about Plaintiff's performance.

53. By May 2002, Plaintiff was twenty-five weeks into her pregnancy.

54. On May 16, 2002, Plaintiff had lunch with several coworkers, including her direct supervisor, Mr. Orlando Marrero.

55. The group went to lunch in Plaintiff's vehicle.

56. When Plaintiff and her coworkers returned from lunch, they parked Plaintiff's vehicle in a handicapped parking space.

57. Plaintiff's supervisor did not object to her parking in the handicapped space on May 16, 2002, but he did object the next day, May 17, 2002.

58. Plaintiff's vehicle lacked the handicapped tag that would have allowed her to legally park in the handicapped space.

59. On May 17, 2002, Plaintiff again parked in the handicapped parking space.

60. The use of a handicapped parking space by an unauthorized person and/or vehicle constitutes a violation of article 2.25 of the Vehicle and Traffic Act of 2000, 9 P.R. Laws. Ann. § 5026.

61. Biovail's management told Plaintiff that she could park at the handicapped space if she produced a medical certificate.

62. The security guard at Biovail informed Plaintiff in a respectful manner that she had to move her vehicle from the handicapped parking space.

63. On May 17, 2002, Mr. Marrero discussed with Plaintiff the fact that she could not park her car in the handicapped parking space, even though the day before he did not object to her parking in the same spot, because she was pregnant, not handicapped.

64. Plaintiff replied that she was pregnant with twins, that she had already gained over twenty four pounds and that it was easier for her to get to her work area if she was allowed to park in the handicapped parking space.

65. Afterwards, Plaintiff felt very sad and depressed because of the incident.

66. On Sunday, May 19, 2002, Plaintiff began bleeding and feeling bad and was taken to Centro Médico.

67. Upon arrival at Centro Médico, and after a medical examination, it was determined that Plaintiff suffered from premature contractions.

68. On May 21, 2002, the doctors decided to submit Plaintiff to an emergency cesarean operation, and she delivered her twin babies prematurely.

69. Plaintiff was terminated from her employment at Biovail Laboratories, Inc., on January 31, 2003.

70. Orlando Marrero took the decision to terminate Plaintiff's employment after discussing it with the general manager and Human Resources Manager.

71. Plaintiff's work assignments at the time of her termination were provisionally assigned to her peer in the department, engineer Brenda Pérez.

72. Ms. Pérez stated in her deposition that she had received no fewer than six (6) drafts for protocols that Plaintiff was working on at the time of her termination.

73. She further stated that she had to start the work again from scratch, since they had numerous comments from different departments, and it was easier for her to start them again than to be able to implement all the comments; she re-wrote them completely instead of finishing them.

74. Plaintiff was substituted by another female engineer, Jacqueline Santos, who was not pregnant at that time.

75. Besides her termination from employment, Plaintiff claims six (6) other specific instances of alleged pregnancy discrimination by Biovail.

76. Of these six claims, one of them is her claim that she was denied the opportunity to attend various professional seminars.

77. Plaintiff received twenty (20) in-house training sessions on different topics during the course of her pregnancy.

78. The opportunity of taking external professional education seminars paid by Biovail is governed by Policy 8.08 of Biovail's employee manual.

79. Plaintiff was given the opportunity to take, and in fact took several external professional seminars while on Biovail's payroll, which included:

   a. Aut. Lab. Central Analytical Data offered by the Puerto Rico College of Chemists in 9/8/01;

   b. Practical Approach Lims QA/QC offered by the Puerto Rico College of Chemists on 8/9/01;

   c. Valid. & The Changing Compl. Lan offered by the Puerto Rico College of Chemists on 9/8/02;

   d. A certificate for completion of a seminar offered by Mettler Toledo with the words MITEL on it, in October 2002.

80. Plaintiff was offered and she refused to attend an external professional seminar offered by the TRANE corporation while she was pregnant, stating in her deposition that such

seminar "would be boring" and she "would fall asleep".

81. However, the seminar was "not necessarily" related to Plaintiff's duties.

82. Another instance of pregnancy discrimination claimed by Plaintiff involves the company's alleged refusal to award her the position of Environmental and Safety Specialist.

83. The consideration of internal candidates to fill out vacant positions in Biovail is governed by Policy 2.03 of the Employee Manual, which states, among others, that "all employees with a minimum of one year's service in their current position will be eligible to apply."

84. The position of Environmental Health and Safety Specialist was adjudicated to another female, Dayra Amill, on April 12, 2002.

85. Plaintiff was ineligible to apply for the Environmental Health and Safety Specialist position, since her seniority date with Biovail was May 7, 2001, and she had not completed one (1) year of service, but was otherwise qualified in her studies for the position.

86. Dayra Amill has a license as an operator of treatment plants of used waters, category four (4).

87. Dayra Amill was not pregnant at the time she was awarded the position of an Environmental Health and Safety Specialist.

88. Plaintiff was pregnant at the time Dayra Amill was awarded the position as an Environmental Health and Safety Specialist position.

89. Plaintiff complained to her supervisor, Mr. Marrero, about the fact that she had not gotten the position of Environmental Health and Safety Specialist, but did not indicate to him that she believed it had not been awarded to her because of her pregnancy.

90. Mr. Marrero replied that the person appointed to the position of Environmental Health and Safety Specialist was not going to last.

91. A third instance of supposed pregnancy discrimination involved Biovail's alleged refusal to promote Plaintiff to the position of Technology Transfer Analytical Manager.

92. Plaintiff applied for the position Technology Transfer Analytical Manager on October 31, 2002 and was not pregnant at that time.

93. Elizabeth Gil de Rubio, Biovail's Human Resources Manager, stated under oath in her deposition that the position of Technology Transfer Analytical Manager that was vacant as of October 2002 had remained vacant throughout at least the time she gave the sworn statement on July 28, 2004.

94. Plaintiff claims that Biovail discriminated against her due to her pregnancy when she was not called upon to participate in the interviews of candidates for a vacant position of instrumentation technician, and claims that she should have been involved in such process, since the technician was allegedly going to be supervised by her.

95. Plaintiff's job description indicates that she had no "direct reports" from anyone, but she did have "indirect reports" from: Building Custodians, Mechanics, Electricians, Instrumentation Technicians, General Mechanics, Utilities Operator, Water Systems Operators.

96. Her job description further stated that she had a "relationship" with: Management; Co-workers; Contractors and Suppliers.

97. Plaintiff was pregnant when she was not afforded the opportunity to participate in the interview for the instrumentation technician.

98. Another instance of pregnancy discrimination claimed by Plaintiff involves Biovail's refusal to allow her the use of a handicapped parking space in their facilities.

99. The Biovail plant at Dorado has approximately one hundred parking spaces and six handicapped parking spaces.

100. The use of handicapped parking spaces is governed by Commonwealth law, which holds that any bearer of a portable handicapped tag issued by the Secretary of Transportation and Public Works can park his/her car in such a place.

101. Plaintiff alleges that the premature birth of her sons was causally related to Biovail's discriminatory actions towards her.

102. Plaintiff stated in her deposition that she had no medical evidence that the premature birth of her twins was caused by the parking incident at Biovail.

103. Plaintiff's husband also testified that no doctor had told him that his wife's premature labor had been caused by the parking incident, and that no doctor had told him of this causal relationship before the complaint had been filed.

104. Dr. Eumari Salicrup testified at her deposition that she never informed Plaintiff or her immediate family the cause for her premature delivery or contractions, and that she was first informed of Plaintiff's incident at Biovail when she was called for her deposition, one month to three weeks before the same.

105. Dr. Eumari Salicrup also testified at her deposition that Plaintiff had told her that her pain had begun Saturday morning.

106. Dr. Eumari Salicrup further testified at her deposition that she excluded an accident, abdominal trauma, smoking and infection as causes for Plaintiff's contractions.

107. Dr. Eumari Salicrup further testified at her deposition that she had jotted down on Plaintiff's medical record that her pregnancy was without complications.

108. Dr. Eumari Salicrup further testified at her deposition that although without complications, Plaintiff's pregnancy was high risk due to her in vitro fertilization and her age, and she recommended that her next pregnancy should be followed up by a perinatologist, an obstetrician and gynecologist specializing in complicated obstetric cases.

109. On May 29, 2002, one of Plaintiff's babies died.

110. On May, 30, 2002, the second baby died.

111. The psychological report from Dr. María M. Acevedo states that Plaintiff González was diagnosed with a moderate major depression exhibiting the following symptoms: depressed mood, lack of interest, insomnia, feelings of guilt, difficulty concentrating, apathy and isolation.

112. The psychological report from Dr. María M. Acevedo does not mention whether Mr. Valencia was suffering from depression.

113. Plaintiff enjoyed ten (10) weeks of maternity leave from May 20, 2002 until July 30, 2002.

114. Plaintiff returned to work on July 31, 2002.

115. Plaintiff's performance was evaluated on January 31, 2003, and com-

prised the one-year period from January 31, 2002 until January 31, 2003.

116. Biovail Laboratories Inc. has an Employee Manual that establishes a system of progressive discipline.

117. The Employee Manual contains a very detailed description of the corrective measures and disciplinary actions that prevail at Biovail.

118. At Biovail, corrective measures include verbal and written warnings, suspension from employment and pay, and discharge.

119. Pursuant to the provisions of the Manual, when an employee infringes a rule of conduct or his/her performance deteriorates, his/her supervisor must give the employee an oral warning.

120. Should the conduct persist, the supervisor must give the employee a written warning.

121. After two written warnings, the employee could be suspended, without pay.

122. If the conduct and/or performance of the employee does not improve after two suspensions, he/she could be dismissed.

123. The manual, however, also states that a certain types of unacceptable conduct can result in immediate termination without the need for a written warning, and management has a right to terminate an employee without first following progressive discipline.

124. Pursuant to the Performance and Job Competency Evaluation System approved by Defendants, when the result of an employee's evaluation has an overall rating of "unacceptable", "a corrective action plan must be developed immediately".

125. Defendant's General Manager admitted that they did not establish a process of progressive discipline for Plaintiff, but she was continuously giv-en feedback regarding her performance.

126. Biovail also has an anti-harassment policy that is part of the employee manual.

127. Plaintiff received a copy of Biovail's Employee Manual on May 2, 2001.

128. Elizabeth Gil de Rubio, who directly supervised Biovail's Human Resources employees, testified that when a new employee begins to work at Biovail, the employee is trained regarding all the policies, including the anti-discrimination policies, sexual harassment, the conduct policies of the company, and disciplinary measures.

129. Plaintiff never complained of any discrimination while employed at Biovail.

130. Plaintiff never sought benefits from the State Insurance Fund, although she alleges that her premature birth was due to an incident or argument that she had with her supervisor, Mr. Marrero.

131. Biovail Laboratories Inc. is an employer insured by the Corporation of the State Insurance Fund, which covers work related accidents and illnesses.

132. Plaintiff was terminated on January 31, 2003, six months after she returned to work following a ten (10) week maternity leave.

133. Plaintiff was dismissed because of unacceptable performance.

134. The dismissal was founded on the results of Plaintiff's Job and Competency Performance Evaluation, dated January 31, 2003.

135. The overall result of the evaluation was unacceptable performance.

136. Pursuant to the evaluation, Plaintiff did not complete any of the projects that were assigned to her, including the qualification of the manufacture areas, the qualification for the Klogner, the qualification of the stability chambers and the documentation pertaining to the TK Fielder and GLATT.

137. Defendants raised various affirmative defenses in their answer to the amended complaint, among them:

a) That the amended complaint fails to state sufficient facts which constitute a tenable cause of action in law or in equity, and upon which relief can be granted;

b) that Co–Defendant Biovail Laboratories, Inc. never discriminated against Ms. González because of her gender, pregnancy status, or otherwise;

c) that all the actions taken by Co–Defendant Biovail Laboratories, Inc. towards Ms. González were taken following sound business judgment, and in accordance with applicable laws;

d) that Co–Defendant Biovail Laboratories, Inc. had just cause to terminate the employment of Ms. González due to her poor performance as an engineer during her last year of employment;

e) that Biovail Laboratories, Inc. is an insured employer under Act 45 of April 18, 1935, 11 P.R. Laws Ann. § 1–260.

f) and that as a consequence thereof, it enjoys immunity from the present claim.

## IV. CONCLUSIONS OF LAW

At the outset, the Court would like to address Defendants' contention that Plaintiffs have not only failed to establish a causal link between their injury in fact, the miscarriage, and Defendants' actions, but that the link never existed. Specifically, Plaintiff stated in her deposition that she had no medical evidence that the premature birth of her twins was caused by the parking incident at Biovail. Her husband testified that no doctor had told him that his wife's premature labor had been caused by the parking incident, and that no doctor had told him of this causal relationship before the complaint had been filed. Furthermore, Plaintiff's treating physician, Dr. Eumari Salicrup testified at her deposition that she never informed Plaintiff or her immediate family the cause for Plaintiff's premature delivery or contractions, and that she was first informed of Plaintiff's incident at Biovail when she was called for her deposition, one month to three weeks before the same.

The Court finds these allegations disturbing, since they indicate that there is no causal link, and Plaintiff cannot prove a causal link, between Plaintiff's injury in fact and Defendants' actions. More to the point, it evidences that Plaintiffs filed a Complaint with absolutely no evidence of causality, which Defendants would have done well to bring to the Court's attention prior to the summary judgment stage.

### A. Standard—the prima facie case

As is well known, under Title VII, it is unlawful for an employer to discharge or otherwise discriminate against any individual on the basis of "race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1). In 1978, Congress amended Title VII by enacting the Pregnancy Discrimination Act ("PDA"), which brought pregnancy, childbirth, and related medical conditions within the existing statutory framework and protected them from sex discrimination. *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1312 (11th Cir. 1994).

■ In proving a case of employment discrimination under Title VII a plaintiff may present either direct or indirect evidence of discrimination. *See Geraci v. Moody–Tottrup, Int'l, Inc.,* 82 F.3d 578, 581 (3d Cir.1996). However, direct evidence of discrimination is highly unusual, so indirect evidence is more commonly utilized to support claims of intentional employment discrimination. *See Id.*

■ Pretext cases are examined under a burden-shifting framework developed by the Supreme Court, in the landmark case of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Courts apply this method by "presum[ing] that, once the plaintiff has shown the [elements of the prima facie case], unlawful discrimination was the most likely reason for the adverse personnel action." *See Id.* At this point, the burden of production shifts to the employer to provide a legitimate nondiscriminatory reason for the adverse employment decision. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If the employer does so, the burden of production then returns to the plaintiff, who must then make a "substantial showing that [defendant's] explanation was false", and that the real reason for the adverse action was sex discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 144, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

■ Therefore, under the prevailing standard, Plaintiff must prove that: (1) she is a member of a protected class, (2) she was qualified for the position and performed her job satisfactorily, (3) that the employer took an adverse employment action against her, and (4) her employer continued to have her duties performed by a comparably qualified person. *See generally, McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817, 36 L.Ed.2d 668; *Santiago–*

*Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 54 (1st Cir.2000); *LeBlanc v. Great Amer. Ins. Co.,* 6 F.3d 836, 841 (1st Cir.1993).

However, discrimination on the basis of pregnancy differs from most other protected personal attributes because while some effects of pregnancy linger beyond the act of giving birth, at some point the female employee is no longer "affected by pregnancy, childbirth, or related medical conditions," for purposes of the PDA. 42 U.S.C. § 2000e(k). Thus, where the employee is pregnant or on maternity leave at the time the adverse employment action occurs, her status as a member of the protected class is evident and the traditional prima facie case is the correct analysis to undertake. When the employee is not pregnant at or around the time that she suffers the alleged adverse employment action, however, her membership in the protected class is less evident, and Courts have found that "in order to make a prima facie showing of discrimination on her theory of relief, plaintiff must do more than show she was, past tense, pregnant." *See e.g. Brinkman v. State Dept. of Corrections,* 863 F.Supp. 1479, 1486 (D.Kan.1994).

■ In a sense, such a limitation is necessary to ensure that pregnancy discrimination claims under Title VII are brought by the individuals who can reasonably claim to be "affected by pregnancy, childbirth or related medical conditions." 42 U.S.C. § 2000e(k). A plaintiff who was not pregnant at or near the time of the adverse employment action, therefore, has an additional burden in making out a prima facie case—she must demonstrate at the prima facie stage that she was "affected by pregnancy, childbirth or related medical conditions" *at the time of the adverse employment action,* by introducing evidence sufficient to allow the case to go to a jury. *See Geraci,* 82 F.3d 578. With

this in mind, the Court now turns to Defendants' arguments.

■ Under the aforementioned analysis, the Court concludes that Plaintiff has not established a prima facie case of discrimination. While it is clear that she is a member of a protected class, and that she was qualified for her position, the Court finds that the temporal nexus between the adverse employment action taken against her and her pregnancy is too far removed to establish a cause of action for discrimination. Thus, the dismissal from the position and the adverse employment action taken were too far removed to meet the standard. Furthermore, the Court finds Plaintiff has not proven that her job performance had been satisfactory.

It is an uncontested fact that Plaintiff's pregnancy had ceased over six months prior to her dismissal. Plaintiff became pregnant in November 2001, enjoyed maternity leave from May 20, 2001 through July 30, 2001, and was dismissed on January 31, 2003. When the adverse action occurred, Plaintiff was not pregnant, and had not been so for quite some time. Courts have generally found that a six-month time span is too far removed to prove discrimination. *Brinkman,* 863 F.Supp. at 1486 (plaintiff terminated approximately one year after giving birth did not make out prima facie case). *See, e.g., Smith v. Bath and Iron Works Corp.,* 943 F.2d 164, (1st Cir.1991) (finding that a six-month gap between harassment and resignation was too far removed); *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311 (11th Cir.1989) (finding no constructive discharge when employee did not resign until one year after last act of harassment); *Jett v. Dallas Indep. Sch. Dist.,* ·798 F.2d 748 (5th Cir.1986) (finding no constructive discharge when the discriminatory conduct took place six months before resignation); *Landrau–Romero v. Banco Popular De Puerto Rico,* 212 F.3d 607, 613 (1st Cir.2000) (holding that em-

ployee's resignation seven months after discrimination incidents were too far removed for consideration of constructive discharge). Six months having passed between her protected status and her dismissal, the Court can only conclude that Plaintiff has failed to establish that she was affected by pregnancy, childbirth or a related medical condition at the time the adverse employment action took place.

Additionally, the Court finds that Plaintiff has not proven that she was performing the duties of her job adequately. While it is true that Plaintiff's first evaluation was satisfactory, her performance went downhill from that moment on. The record is replete with information from Plaintiff's superiors detailing her lack of attention to detail, her unfinished projects, her faulty protocols, and the fact that many of her projects had to be assigned to other employees for completion. While Plaintiff has presented evidence attempting to refute some of these claims, the Court finds her evidence is not material, and further, on the record provided, the Court is not convinced that she performed her job satisfactorily as she claims.

In most cases, when a district court evaluates the question of whether an employee was meeting an employer's legitimate employment expectations, the issue is not the employee's past performance but "whether the employee was performing well at the time of [her] termination." *Karazanos v. Navistar Intern. Transp. Corp.,* 948 F.2d 332, 336 (7th Cir.1991). Additionally, Courts have held that the general statements of co-workers, indicating that a plaintiff's job performance was satisfactory, are insufficient to create a material issue of fact as to whether a plaintiff was meeting her employer's legitimate employment expectations at the time she was terminated. *See, e.g., Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1460 (7th

Cir.1994) ("cases ... give little weight to statements by supervisors or co-workers that generally corroborate a plaintiff's own perception of satisfactory job performance."); *see also Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir.2002). It is to Biovail's upper management that the Court must look, and therein it has found that Plaintiff's performance was not meeting Biovail's standards. As stated, the record is replete with information from Plaintiff's superiors detailing her lack of attention to detail, her unfinished projects, her faulty protocols, and the fact that many of her projects had to be assigned to other employees for completion. Therefore, Biovail did not act improperly in dismissing her.

■ Indeed, even if the Court was undecided on the issue of whether Plaintiff met the requirements of the second prong of the prima facie case analysis, that she was performing her job in a satisfactory manner, "this court may advance to an ultimate issue in a summary judgment analysis and consider the discrimination question notwithstanding a dispute over a fact necessary for a prima facie case." *EEOC v. Our Lady of the Resurrection Med. Ctr.*, 77 F.3d 145, 149 (7th Cir.1996); *see also Jayasinghe v. Bethlehem Steel Corp.*, 760 F.2d 132, 135 (7th Cir.1985) ("The prima facie threshold is no longer a relevant issue once the defendant has come forward with evidence of legitimate reasons for its actions that would rebut a prima facie showing of discrimination."). Thus, instead of weighing the evidence in the context of Plaintiff's prima facie case, the Court will consider it in deciding whether Defendant can establish legitimate, nondiscriminatory reasons for the firing. *See Alvarez Cabrera v. Trataros Constr.*, 184 F.Supp.2d 149 (D.Puerto Rico 2002) (holding that the prima facie case and the employer's non-discriminatory reason are "irretrievably intertwined" where the employer asserts that it discharged the plaintiff because her job performance was not satisfactory, and thus it was necessary to examine Defendants' non-discriminatory reasons) *quoting Lawrence v. Northrop Corp.*, 980 F.2d 66, 69 (1st Cir.1992).

### B. *The non-discriminatory reason*

■ Analyzing Defendant's non-discriminatory reasons for undertaking the personnel actions they did, the Court would still find that Plaintiff is unable to meet her ultimate burden of showing Biovail's non-discriminatory reason for termination was a pretext for sex discrimination.

As is well known, the next prong of the *McDonnell Douglas* analysis shifts the burden of production to the Defendant to articulate a legitimate, non-discriminatory reason for the employees' discharge. Defendant claims—and presents ample evidence in support thereof—that Plaintiff was not performing her duties to Biovail's satisfaction, and that upper management had received a number of complaints about her performance, including unfinished projects and faulty protocols. The Court finds that Defendants have met their burden with the evidence presented.

Unlike the prima facie case, an employee's general averments that she performed adequately are insufficient to create a genuine issue of fact, and Plaintiff's denial of ruining or damaging parts is not enough to preclude summary judgment. It is well established that at this stage, Plaintiff must produce some independent evidence showing that the company's motives are not believable. Plaintiff has been unable to bring forth material evidence to rebut Defendant's reason for her dismissal.

Furthermore, the record is clear in the fact that not only is the Biovail management comprised of a substantial number of women, many of whom enjoyed maternity leave and returned to work for the company, but Plaintiff is the only member of a

protected class that enjoyed maternity leave and was subsequently dismissed. Simply put, there is no evidence that Biovail discriminated against its employees or against Plaintiff on the basis of pregnancy, given the fact that there is only one incident of a dismissal—Plaintiff's—and the same did not even occur during a pregnancy, but rather six months after the pregnancy ended. Under these facts, the Court cannot possibly find that one dismissal amounts to a case of discrimination.

Regarding the jobs that Plaintiff alleges she was qualified for, but was not hired for, the record is clear Plaintiff had not been working at Biovail the requisite amount time in order to qualify for the Environmental Health and Safety Specialist position. The fact that she had other qualifications that Ms. Dayra Amill did not have is irrelevant to this discussion—the fact is that at the moment the decision to deny her the position was taken, Plaintiff did not have the requisite amount of time working with the company in order to be even considered for the position. The Court finds no error in Defendant's actions regarding this issue.

Regarding the second job, the Technology Transfer Analytical Manager Position, while Plaintiff may have possessed the requisite qualifications, besides alleging she was pregnant, Plaintiff must show that another person was hired in her stead. She has failed to do so, since this position was not filled, and remained, as of July, 2004, vacant. Therefore, this argument is inapposite.

In short, the Court finds that Plaintiff has failed to introduce evidence that gender discrimination more likely motivated Defendant's actions, and has failed to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could rationally find

them 'unworthy of credence[.]' " *Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir.1994). In fact, Plaintiff has not presented any evidence, other than mere speculation, to demonstrate discriminatory intent by Biovail. For instance, the only basis Plaintiff has to claim that the Environmental Health and Safety Specialist position was not given to her because of her pregnancy status is the fact that Defendant hired a person that was not as qualified as she was. Aside from Plaintiff's subjective perception of her own qualifications, the record lacks support for her claims and further bolsters Defendant's argument—that she did not have enough tenure at Biovail to be even considered for the position.

■ Regarding the parking incident, in which Plaintiff alleged that Defendants discriminated against her in not permitting her to park her vehicle in a handicapped parking space, the Court can find no justification that would enable an employer to wilfully violate the law. While it is true that Biovail allowed Plaintiff to park her vehicle there on one occasion, and thus acted improperly, it can find no error in their subsequent decision to restrict the space for handicapped people only, as required by law.

Regarding the alleged training, there is documentation evidencing that Plaintiff participated in a multitude of training opportunities during her tenure at Biovail, and that she did not attend at least a particular one that was offered to her. This alone belies her claims that Biovail did not afford her opportunities to train.

The Court cannot help but notice the large percentage of women in leadership and professional positions in Biovail, the high number of female employees from every educational and responsibility levels (including Plaintiff's peer, Brenda Pérez) that became pregnant and who enjoyed maternity benefits while on Biovail's pay-

roll and who are still employed with the company. As previously stated, Plaintiff is the only one who enjoyed maternity leave and was subsequently dismissed. Additionally, Defendants' evidence shows that in the last four years, there were fifteen (15) female Biovail employees, including Mr. Marrero's secretary, who enjoyed maternity leave and who were not dismissed. The Court sees no error in this.

Finally, the Court can see that Biovail had a detailed anti-harassment and anti-discrimination policy, that all employees received training in Biovail's anti-discrimination policy from the Human Resources manager upon starting their jobs at Biovail, with detailed instructions about the employees' rights and mechanisms to follow in airing their grievances, which were available to Plaintiff and *which she failed to take advantage of.* The lack of evidence to support Plaintiff's claims, together with the lack of causality present in this case, can only result in dismissal of this case.

## V. CONCLUSION

As is well known, on a motion for summary judgment, the Court must accept as true all reasonable inference that favor the nonmoving party. However, the Court may only consider reasonable inferences; it may not improperly consider those inferences that are unreasonable. It remains the Court's function, however, to determine whether there is sufficient material controverted evidence for a claim to reach the trier of fact. The Court has drawn all reasonable inferences in favor of Plaintiff and finds that there are no genuine issues of material fact that remain to be decided by a jury. Although Plaintiff's loss is unfortunate and the Court sympathizes with her and her husband, it cannot find that a valid cause of action exists on the basis of this record. The Court therefore **GRANTS** Defendants' motion for summary judgment, and **DISMISSES WITH PREJUDICE** all federal causes of action.

Having disposed of all federal claims, the Court does not reach Plaintiff's claims arising under Puerto Rico law, and hereby **DISMISSES** them **WITHOUT PREJUDICE.**

**IT IS SO ORDERED, ADJUDGED AND DECREED.**